UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RICHARD SZOSTAK,

                          Plaintiff,        **14-cv-06534**
                                            **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN,
Commissioner of Social Security,

                          Defendant.
_____


        Plaintiff Richard Szostak ("plaintiff") brings this action

pursuant to Title II of the Social Security Act ("The Act"),

seeking review of the final decision of the Commissioner of Social

Security ("defendant" or "the Commissioner") denying his

application for disability insurance benefits("DIB").

        Presently before the Court are the parties' competing motions

for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.   For the reasons set forth below,

plaintiff's motion is denied and defendant's motion is granted.

                        <u>**PROCEDURAL HISTORY**</u>

        On May 2, 2012 plaintiff filed an application for DIB alleging

disability as of March 29, 2012 due to his Achilles tendonitis,

heart problem, and attention issues. Administrative Transcript

("T.") 13, 76, 161.   Following a denial of that application, a

video hearing was held at plaintiff's request on March 20, 2013

before administrative law judge ("ALJ") James G. Myles, and

testimony was given by plaintiff and vocational expert Abby May. T. 34-66.

In applying the required five-step sequential analysis, as contained in the administrative regulations promulgated by the Social Security Administration ("SSA") (*see* 20 C.F.R. §§ 404.1520, 416.920; *Lynch v. Astrue*, No. 07-CV-249, 2008 WL 3413899, at *2 [W.D.N.Y.2008] [detailing the five steps], the ALJ made, among others, the following findings: (1) plaintiff met the insured status requirements of the Act through December 31, 2015; (2) since the alleged onset date of disability, March 29, 2012, his heart post myocardial infarction with stents, torn/ruptured Achilles tendon, hypertension, obesity, recent tear of right knee meniscus, osteoarthritis in hands bilaterally, affective disorders and substance addiction disorders were severe impairments; (3) his impairments did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) prior to February 1, 2013, the onset date of plaintiff's disability, plaintiff had the residual functional capacity ("RFC") to perform unskilled and routine light work as defined in 20 CFR 404.1567(b), with the following limitations: frequently balance and stoop, occasionally perform other postural activities, and avoid concentrated exposure to temperature extremes, pulmonary irritants, and hazards, humidity; (5) beginning on February 1, 2013, plaintiff had the RFC to perform unskilled and routine sedentary work as defined in 20 CFR 404.1567(a) with the following limitations added

those listed above: occasionally lift ten pounds and frequently less than ten pounds and stand or walk for two hours, even with use of a cane; (6) plaintiff was unable to perform any past relevant work since March 29, 2012; (7) beginning on February 1, 2013, considering plaintiff's age, education, work experience, and residual functional capacity, there were no jobs in the national economy that he could perform; and (8) plaintiff became disabled as of February 1, 2013. T. 15-17.

The Appeals Council denied plaintiff's request for review of the ALJ's determination of the onset date of his disability. T. 1. This action ensued.

## DISCUSSION

## I.  General Legal Principles

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Section 405(g) provides that the District Court "shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (2007). The section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record.

When determining whether the Commissioner's findings are supported by substantial evidence, the Court's task is "'to examine

the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999), *quoting Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam). Section 405(g) limits the scope of the Court's review to two inquiries: whether the Commissioner's findings were supported by substantial evidence in the record as a whole and whether the Commissioner's conclusions are based upon an erroneous legal standard. *See Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir.2003).

## III. The Commissioner's Decision Denying Plaintiff Benefits is Supported by Substantial Evidence.

Plaintiff's first contention is whether the ALJ's determination that he was not disabled, with the RFC to perform light work with the aforementioned limitations, from March 29, 2012 to January 31, 2013 is supported by substantial evidence. Plaintiff specifically asserts that he suffered his second myocardial infarction, a traumatic origin impairment, on March 29, 2012 and continued to experience related symptoms and conditions, including coronary artery disease, unstable angina, carotid artery stenosis, and severe fatigue through February 2013. Plaintiff's memorandum of law, p. 18-20. Defendant responds that the record supports the ALJ's finding that plaintiff's myocardial infarction was of a non-traumatic origin under Social Security Ruling ("SSR") 83-20 because plaintiff was neither expected to die nor unable, or expected to be unable, to engage in substantial gainful activity

for a continuous period of 12 months prior to February 1, 2013. Defendant's memorandum of law, p. 22-25.

Upon its review of the record in its entirety, this Court finds that the record, particularly the relevant medical records prior to February 1, 2013, contains substantial evidence to support the ALJ's decision.

**A. Relevant medical evidence.**

The record reveals that plaintiff was treated by cardiologist Dr. Gerald Ryan on March 28, 2012, one year after the placement of a right coronary artery stent, for occasional chest pain and a stress test. T. 213, 388. Dr. Ryan noted an ongoing diagnosis of acute myocardial infarction and preexisting diagnoses of coronary artery disease and stenting. T. 214. The physical examination of plaintiff was unremarkable. After abnormal stress test during which he could not breath, however, plaintiff was admitted to the hospital on March 30, 2012 for a left heart angiogram. T. 209, 240, 395. A stent was successfully placed into plaintiff's LAD coronary artery and he was stable for discharge the next day with no complications from the procedure. T. 240, 242, 395-398. He was advised to continue aspirin and Effient. T. 273, 396.

By April 11, 2012, Dr. Ryan noted that plaintiff was doing well, with no chest pain or dyspnea, but that he was complaining of fatigue. T. 209. On May 16, 2012, plaintiff was evaluated at Westfall Cardiology for chest pain and shortness of breath. T. 255. It was noted that plaintiff had an episode of chest pain three

weeks earlier, with no recurrent chest pain, and that he felt very tired with exertion. T. 255. Plaintiff exhibited anxiety and fear concerning his history of heart problems. T. 255. Apart from plaintiff's complaints, his physical exam was normal. T. 256. He was diagnosed with status post myocardial infarction in 2011, coronary artery disease status post right coronary artery intervention and LAD, anxiety, recovering alcohol and drug abuser, and GERD. T. 257. Plaintiff referred for coronary angiography and possible angioplasty. T. 257, 354. On May 8, 2012, Dr. Ryan's physical examination of plaintiff was unremarkable, and he advised plaintiff to continue exercise as tolerated, take medications as prescribed, and return in six months. T. 399-400.

On May 9, 2012, plaintiff's family doctor, Dr. Tiffany Aiello, noted that plaintiff had two stress-related myocardial infarctions and three stents within the last year, lessening Achilles tendinitis pain, shortness of breath, and occasional chest pain. T. 265. Her physical examination of plaintiff was normal, apart from his ankle pain. On May 17, 2012, Dr. Aiello noted that plaintiff's ankle pain was slowly improving with the use of a brace and that he was having trouble sleeping. T. 261.

In an RFC questionnaire completed by Dr. Aiello, dated May 17, 2012, she opined that plaintiff's impairments, primarily chest pain, depression, and back pain, had lasted, or were expected to last, for at least twelve months. T. 339. She further opined that plaintiff's pain constantly interfered with his ability to perform

6

even simple work tasks and that he was incapable of working even low stress jobs because he panicked "in any type of stress." T. 340. She opined that plaintiff could sit and stand or walk for only less than two hours in an eight-hour work day. T. 341. She stated that plaintiff must walk for ten minutes every five to ten minutes during an eight-hour day. T. 341. Plaintiff must use a cane for occasional standing or walking and he could not lift ten or more pounds. T. 341. Dr. Aiello further opined that plaintiff could never twist, stoop, crouch, squat, or climb ladders or stairs. T. 342. He was likely to miss more than four days of work per month. T. 342.

On May 22, 2012, plaintiff was treated at Rochester General Hospital for placement of a stent to the left anterior descending artery. T. 346, 358, 266. He was diagnosed with coronary artery disease and unstable angina by Dr. Ong of Westfall Cardiology. T. 360, 366. Upon his discharge the following day, plaintiff was instructed to avoid lifting anything over ten pounds or driving for five days and to gradually increase his activity to his normal level. T. 346. During a follow up visit with Westfall Cardiology on May 30, 2012, it revealed that plaintiff was "feeling tremendously better" and "very happy with the results of the angiogram." T. 362, 434-435. He denied any new symptoms, and he was instructed to return in two months. T. 363.

On June 29, 2012, Dr. Harbinder Toor examined plaintiff at the request of the Division of Disability Determination and opined

moderate to severe limitations in standing, walking, squatting, and lifting and moderate limitations in exertion, due to his cardiac condition, and sitting. T. 409-410. Plaintiff's constant Achilles' tendinitis pain interfered with his daily routine and balance. T. 410. Dr. Harbinder noted that plaintiff had no chest pain since his most recent stent in May 2012. T. 406. Dr. Harbinder opined that plaintiff's prognosis was guarded. T. 408. During a psychiatric evaluation conducted by Dr. Yu-Ying Lin on July 18, 2012, plaintiff reported difficulty sleeping and a history of drug and alcohol abuse. T. 141. Dr. Lin observed mild impairment in attention and concentration and recent and remote memory due to below average intellectual functioning. T. 415-416. Dr. Lin opined that plaintiff had difficulty dealing with stress appropriately, but that his stress-related problems did "not appear to be significant enough to interfere with [his] ability to function on a daily basis." T. 416. Plaintiff's prognosis was good, and Dr. Lin recommended individual psychological therapy if needed. T. 417. Dr. Lin's psychiatric review technique form, dated July 31, 2012, reflected his opinion that plaintiff's mental impairments were not severe. T. 418.

Plaintiff was again seen by Westfall Cardiology on July 31, 2012 where he reported "feeling rather well" with no angina pectoris-type symptoms or chest problems. T. 437. The carotid doppler revealed bilateral plaquing of both common internal carotids, high grade stenosis on the left side, and mild to

moderate stenosis on the right side. T. 438. Diagnostic imaging on August 16, 2012 revealed 50% luminal stenosis at the right carotid bifurcation and 55-60% luminal stenosis at the left and no evidence of carotid or vertebral artery dissection. T. 449. On August 22, 2012, Dr. Patrick Riggs of Vascular Surgery Associates opined that plaintiff had "carotid disease on both sides, but not bad enough to require any intervention in the asymptomatic state." T. 460.

On September 5, 2012, plaintiff reported being unable to perform activities such as mowing his lawn or carrying items up stairs without becoming very tired, but he denied dyspnea, orthopnea, or lower-extremity edema and had no clinical angina pectoris. T. 466. Plaintiff underwent a stress echocardiogram on September 10, 2012, which was unremarkable apart from plaintiff's physical deconditioning. T. 469-471, 498. Cardiologist Dr. Adel Soliman changed plaintiff's medication to see if it was related to his fatigue. T. 472. Orthopedist Dr. Michael Colucci ordered an MRI of plaintiff's left ankle to further evaluate his Achilles tendinitis, concluding, nonetheless, that plaintiff could "work without restrictions." T. 478. On October 1, 2012, Dr. Aiello treated plaintiff for left rib pain that he sustained while walking in the woods with his dogs, and, at that time, he denied any fatigue or chest problems and his physical examination revealed no cardiovascular abnormalities. T. 481-482.

A physical RFC assessment completed by consultant Dr. Robert Mogul on October 12, 2012 reveals Dr. Mogul's opinion that plaintiff had mild exertional limitations prospectively, with moderate postural limitations (occasional climbing of ramps, stair, ladders, ropes and scaffolds, kneeling, crouching and crawling), no manipulative or visual limitations, and some environmental limitations (avoid concentrated exposure to extreme cold and heat, humidity, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards). T. 485-488.

Dr. Soliman's notes from October 16, 2012 reveal that plaintiff was "feeling reasonably well" apart from his fatigue, dizziness when bending over, and muscle pulling in the chest when he carried about 40 pounds. T. 498. Dr. Soliman, opining that plaintiff was doing well clinically, saw no evidence of effort-induced angina pectoris-type symptoms nor any need to pursue another ischemic work up. T. 498-499. She recommended that plaintiff return for a follow-up appointment in February. T. 499.

Plaintiff's ankle MRI, conducted on October 9, 2012, revealed chronic tendinosis of the Achilles tendon, acute peritendinitis, minor posterior tibial tenosynovitis, and fluid in the flexor hallucis longus. T. 512. On October 25, 2012, Dr. Colucci noted that plaintiff's left ankle had improved with the use of a brace and that he "appear[ed] comfortable." T. 514-515. Plaintiff experienced improvement in his ankle while attending physical therapy from November 2012 to January 2013. T. 516-524, 539. By

January 2013, Dr. Colucci noted that plaintiff was "100% better," continuing with therapy, and using his brace intermittently as needed. T. 532. Dr. Colcucci's examination of the left ankle revealed slightly tender minimal residual edema throughout the Achilles tendon. T. 533. Plaintiff was requested to return if his symptoms worsened. T. 533.

**B. Non-medical evidence.**

At his hearing, plaintiff testified that he was working on roof in March 2012 when he had his second heart attack and tore his Achilles tendon at the same time. T. 38-39. When asked what prevented him from working, plaintiff replied that he had four stents in his heart and would "probably" have to undergo bypass surgery. T. 40. He also referred to his "learning disabilities" and torn Achilles tendon, testifying that "there's nothing else really they can do for it." T. 40.

When asked about medical records indicating that his tendon had completely recovered, plaintiff testified that he could not engage in "lifting or running," and that his pain was "at least an eight to nine" out of ten "everyday." T. 41. Plaintiff testified that he could do very little walking, sitting, standing, or lifting and carrying due to his pain, a back problem and arthritis. T. 45, 55. On an average day, plaintiff talked to his mother on the telephone and went to the mall with some friends. T. 46. Plaintiff had been taking Suboxone for a number of years to control

his drug addiction[1]. T. 47-48. He had been using a cane for about two months, and he was fatigued on a daily basis. T. 55, 56-57.

### C. Plaintiff's RFC prior to February 1, 2013.

Although the determination of a claimant's RFC is reserved for the Commissioner (*see* 20 C.F.R. § 416.927[e][2]), an RFC assessment "is a medical determination that must be based on probative medical evidence of record." *Lewis v. Comm'r of Soc. Sec.*, 2005 WL 1899399, *3 (N.D.N.Y.2005), citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d 1998). "Accordingly, an ALJ may not substitute his own judgment for competent medical opinion." *Id.* An ALJ may not selectively choose medical evidence that favor a finding of no disability. *See e.g., Lynch v. Astrue*, 2011 WL 2516213, at *8 (W.D.N.Y.2011) (internal citations omitted).

Plaintiff contends that the ALJ improperly and arbitrarily disregarded his alleged onset date of March 29, 2012, when he experienced his second heart attack. In his decision, however, the ALJ noted that plaintiff had a "relatively lengthy history of treatment" and a history of myocardial infarction, which began in March 2011. T. 18. Plaintiff recovered well from the placement of a coronary stent in April 2011, showed no symptoms, and stated his desire to return to work. T. 18; *see* 236. The ALJ's decision then

---

[1]

The record reveals that plaintiff has a history of substance abuse and was prescribed Suboxone by Dr. Aiello to treat his opioid dependance, which was considered by the ALJ in his decision but was not found to have contributed to plaintiff's disability prior to February 1, 2013.

details plaintiff's medical issues following plaintiff's next episode of chest problems, which occurred a year later in March 2012. Plaintiff spent one night in the hospital after a positive stress test and the subsequent placement of another stent. The ALJ noted that throughout Dr. Ryan's treatment of plaintiff's heart condition, the cardiologist repeatedly observed that plaintiff "was doing well with only relatively conservative treatment." T. 18.

The ALJ further noted that despite plaintiff's brief hospitalization in May 2012 for the placement of another stent, he was feeling "'tremendously better'" within a week, and by June 2012, there was "'significant improvement' to [his] health." T. 19. Although there was evidence of bilateral plaquing of both common internal carotids and carotid disease in July 2012, as noted by the ALJ, the record reveals that plaintiff's condition did not require intervention. T. 19.

Plaintiff asserts that his disabilities were of a traumatic origin beginning on the date of his March 29, 2012 heart attack. There is little medical evidence in the record, however, to show that he was expected to die as a result of his injury or was expected to be unable to engage in substantial gainful activity for a continuous period of at least 12 months, as required by Social Security Ruling ("SSR") 83-20. *See* Titles II and XVI: Onset of Disability, 1983 SSR 83-20, 1983-1991 Soc. Sec. Rep. Serv. 49, 1983 WL 31249 (S.S.A.).

The record evidence described above establishes the absence of medical evidence restricting plaintiff from performing light work due to his heart condition, the lack of hospitalizations apart from those due to the uneventful placement of stents, plaintiff's generally conservative treatment, and the absence of restrictions on plaintiff's daily activities to the extent alleged during the relevant period. Although a claimant's allegation regarding the date of onset, if consistent with the medical evidence in the record, must generally be accepted, the ALJ may determine that the onset date is other than what has been alleged if he fulfills his affirmative obligation to adduce substantial evidence to support his finding. *See Czerniejewski v. Astrue*, 2008 WL 4296638, at *5 (W.D.N.Y.2008).

Here, the Court finds that the ALJ has met this obligation. As discussed above, the record is devoid of evidence that plaintiff was expected to die or to be unable to engage in substantial gainful activity for a continuous period of at least 12 months as a result of his March 29, 2012 heart attack. Consequently, the Court finds that the ALJ properly considered plaintiff's allegations, his work history, and the medical and other evidence concerning the severity of plaintiff's impairments in rejecting his alleged onset date. *See id.*

**D. The treating physician rule.**

Plaintiff also contends that the ALJ failed to appropriately weigh the opinions of Plaintiff's treating source, Dr. Aiello.

Plaintiff's memorandum of law, p. 23-26. Defendant responds that the ALJ properly gave little weight to two of Dr. Aiello's opinions, which were clearly inconsistent with the other medical evidence, including the opinions of specialists Dr. Ryan and Dr. Colucci concerning their areas of specialty. Defendant's memorandum of law, p. 29-30.

Under the treating physician rule, the medical opinion of a claimant's treating physician will be given "controlling" weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Green-Younger*, 335 F.3d at 106. Medically acceptable clinical and laboratory diagnostic techniques include consideration of "a patient's report of complaints, or history, [a]s an essential diagnostic tool." *Id.* at 107 (internal quotation marks omitted).

In affording little weight to the May 2012 opinion of Dr. Aiello, the ALJ noted that her responses on the RFC questionnaire assessing plaintiff with severe exertional and postural limitations were inconsistent with other medical evidence, particularly the treatment notes and opinions of Dr. Ryan and Dr. Lin. T. 22. Later, the ALJ noted that Dr. Aiello's opinion from October 2012 that plaintiff was not expected to recover from his Achilles tendinitis until October 2013 contrasted greatly with Dr. Colucci's October 2012 and January 2013 treatment notes and

opinions. T. 23. The other medical evidence in the record also supports the ALJ's conclusion here, including the treatment notes and opinions of Dr. Soliman and Dr. Riggs, which were based on their physical examinations, diagnostic imaging, EKG results, and plaintiff's own reports. T. 437, 449, 460, 469-471, 498-499. The Court therefore finds no error in the weight assigned by the ALJ to Dr. Aiello's opinions. The Court has also considered plaintiff's contention that the ALJ failed to properly weigh the consultative opinion of Dr. Toor and finds it to be similarly without merit.

Based on the foregoing, this Court finds that the record as a whole establishes that the ALJ's decision is supported by substantial evidence.

## CONCLUSION

Accordingly, the defendant's cross-motion for judgment on the pleadings is granted, and plaintiff's motion for judgment on the pleadings is denied. The complaint is dismissed in its entirety with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

S/ MICHAEL A. TELESCA
HONORABLE MICHAEL A. TELESCA
UNITED STATES DISTRICT JUDGE

DATED: Rochester, New York
        August 24, 2015